**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THOMAS COSTELLO AND MEGAN BAASE KEPHART, ET AL., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>       Plaintiffs,<br><br>  v.<br><br>BEAVEX INC.,<br><br>       Defendant. | NO. 12-cv-7843<br><br>Judge Virginia M. Kendall<br><br>Magistrate Judge Mary M. Rowland |

## DEFENDANT'S MEMORANDUM OF LAW

## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

Defendant BeavEx, Inc. ("BeavEx") is a delivery service courier company. (*See* www.beavex.com). BeavEx is therefore indisputably a "motor carrier" as that term is used in the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"). 49 U.S.C. § 13102(14) (defining "motor carrier" as a "person providing motor vehicle transportation for compensation"). Plaintiffs are current or former courier drivers for BeavEx. BeavEx engages its courier drivers as independent contractors. Accordingly, BeavEx does not provide its couriers with benefits it provides to its staff employees, such as health insurance, retirement, or workers' compensation, nor does BeavEx pay payroll or employment insurance taxes for its independent contractor couriers.

Plaintiffs bring this case under Section 2 of the Illinois Wage Payment and Collection Act, 820 ILCS 115/2 ("IWPCA"). Section 2 places limits on when a company may engage people as independent contractors, rather than employees. The most pertinent restriction here is contained in Section 2(b). That Illinois statutory provision does permit companies to engage individuals as independent contractors, but only in very limited circumstances: if, *but **only** if*, the work performed by the individual "is either outside the usual course of business [of the company] or is performed outside of all of the places of business" of the company. 820 ILCS 115/2(b).

Plaintiffs allege that their work as BeavEx couriers does not meet Section 2(b)'s limited exception for "independent contractor." Specifically, Plaintiffs allege that their courier work was not outside the usual course of BeavEx's courier business, and that their work was not performed outside of BeavEx's place of business. Plaintiffs therefore allege that Illinois law as expressed in

Section 2 prohibits BeavEx from engaging them as independent contractors, and mandates that BeavEx treat and pay them as employees.

Congress passed the FAAAA to deregulate the United States' transportation industry. Congress therefore included an express **preemption clause** in the FAAAA. That preemption clause prohibits States from enacting or enforcing "a law … **related to** a price, route or service of any motor carrier … with respect to the transportation of property." 49 U.S.C. § 14501(c)(1) (emphasis added). The Supreme Court has determined that these words express a "broad" pre-emptive purpose, and that preemption occurs "even if a state's effect on rates, routes or services 'is only indirect,'" so long as the effect is more than "tenuous, remote, or peripheral ..." *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370, 371 (2007) (quoting and following *Morales v. Trans World Airlines*, 504 U.S. 374, 386, 390 (1992)).

Against this backdrop, the FAAAA preempts Plaintiff's IWPCA claims. The IWPCA's purported prohibition of BeavEx's engagement of Plaintiffs as independent contractors, and mandate that BeavEx treat and pay Plaintiffs as employees, would clearly interfere with BeavEx's prices and services. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1049, 1058 (9th Cir. 2009) ("*ATA*") (Port of Los Angeles requirement prohibiting the use of "independent" operators and mandating the use of "employees" would force motor carriers "to incur large costs which, if it manages to survive those, will disrupt and change the whole nature of its business"). The FAAAA therefore preempts the IWPCA's independent contractor prohibition because it "relates to" the prices and services of BeavEx. *Id*. at 1053-56. This is not a close question:

> Defendants' [Port of Los Angeles] attempt to shape the labor forces of motor carriers … [though its] hiring restrictions on independent owner-operators … is the type of state economic regulation that Congress sought to preempt with the FAAAA.

Brief for the United States of America as Amicus Curiae at 19 (Oct. 20, 2008), *ATA*, 559 F.3d 1046 (9th Cir. 2009) (attached as Exh. A); *ATA*, 559 F.3d at 1053 ("that the [prohibition against the use of independent operators and mandate of the use of employees] relate[s] to prices, routes or services of motor carriers can hardly be doubted"). Consequently, Plaintiffs' claims fails as a matter of law and BeavEx's motion for summary judgment should be granted.

I. <u>THE GOVERNING LEGAL STANDARD FOR FAAAA PREEMPTION</u>

   A. The Federal Aviation Administration Authorization Act of 1994

The FAAAA is part of Congress' legislative effort to deregulate the trucking industry:

> In 1978, Congress determined that maximum reliance on competitive market forces would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act. In order to ensure that the States would not undo federal deregulation with regulation of their own, that Act included a pre-emption provision that said "no State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier." … 49 U.S.C. App. § 1305(a)(1) …
>
> In 1980, Congress deregulated trucking. See Motor Carrier Act of 1980, 94 Stat 793. And a little over a decade later, in 1994, Congress similarly sought to preempt state trucking regulation. See Federal Aviation Administration Authorization Act of 1994, 108 Stat. 1605-1606 … In doing so, it borrowed language from the Airline Deregulation Act of 1978 and wrote into its 1994 law language that says: **"[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."** 49 U.S.C. § 14501(c)(1) …

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 367-68 (2007) (emphasis added, other internal marks and citations omitted). The highlighted preemption provision was specifically designed to preempt a "patchwork" of state regulation of motor carriers. H.R. Conf. Rep. 103-677 (1994), at 86 (attached as Exh. B). Specifically, Congress found that "State economic regulation of motor carrier operations causes significant inefficiencies, increased costs, reduction of competition, inhibition of innovation and technology and curtails the expansion of markets," costing customers "$5-12 billion" per year. (*Id*. at 87). Congress therefore passed the FAAAA to

3

"permit our transportation companies to freely compete more efficiently and provide quality service to their customers." (*Id*. at 88).

The FAAAA defines "motor carrier" as a "person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). Delivery service companies like BeavEx are subject to the FAAAA's protections because they provide motor vehicle transportation for compensation. (SOF ¶¶ 1-3)[1]; *see N.H. Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 70 (1st Cir. 2006) (United Parcel Service is a motor carrier under the FAAAA), *aff'd*, 552 U.S. 364 (2007).

### B. The FAAAA's Preemptive Scope Is Very Broad

As stated above, the FAAAA's preemption provision is based upon the preemption provision of the Airline Deregulation Act ("ADA"). *Rowe*, 552 U.S. at 370 ("the Congress that wrote the [FAAAA] language before us copied the language of the air-carrier pre-emption provision of the Airline Deregulation Act of 1978").[2] *Rowe* therefore turned to its decision in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), which interpreted the ADA's preemption provision, to interpret the FAAA's substantively similar preemption provision. *Rowe*, 522 U.S. at 370 ("we follow *Morales* in interpreting similar language in the [FAAA] before us here").

*Morales* reasoned that the "key phrase" in the ADA's preemption provision is the term "relating to," and that:

> [t]he ordinary meaning of these words is a broad one - to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or

---

[1] BeavEx is contemporaneously filing its L.R. 56.1(a)(3) Statement of Material Facts As To Which There Is No Genuine Dispute. This brief will cite those facts as "SOF."

[2] The ADA and FAAAA employ indistinguishable language with respect to the preemption of state laws. The only difference is that, when originally enacted, the ADA used the terms "relating" to "rates" (ADA, Pub. L. No. 95-504, § 4(a), 92 Stat. 1705, 1707-08 (1978)), while the FAAAA uses the terms "related" to "price." The provisions now use identical terms, as the current version of the ADA uses the phrase "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1).

> connection with,' Black's Law Dictionary 1158 (5th ed. 1979) - and the words thus express a broad pre-emptive purpose.

*Morales,* 504 U.S. at 383 (citations omitted); *see also id*. at 384 (explaining that "relating to" is language that has a "broad scope" and an "expansive sweep") (citations omitted). To give effect to this provision, *Morales* held that *any* law that has a connection with, or reference to, prices, routes, or services is pre-empted. 504 U.S. at 384. Preemption therefore occurs "even if a state law's effect on rates, routes or services 'is only indirect,'" provided that the effect on the transportation of property is more than "tenuous, remote, or peripheral." *Rowe*, 552 U.S. at 370, 371 (quoting and following *Morales*, 504 U.S. at 386, 390).

### C. Illustrative Applications Of The FAAAA's Broad Preemptive Scope

The *Rowe* decision demonstrates with remarkable clarity the breadth of FAAAA preemption. In 2003, Maine enacted a statute that prohibited retailers from using a delivery service company to ship tobacco unless that company had a system for verifying the age and identity of the shipment's recipient. 552 U.S. at 368-69. Even though the law was directed at retailers, not shippers, and despite the slight requirement imposed on the delivery service companies – literally just checking a person's ID – the Court nonetheless held that it had too great an effect on motor carrier services, and thus was preempted. *Id.* at 371-73. *See also Missing Link Jewelers, Inc. v. United Parcel Serv., Inc.*, 2009 WL 5065682, at *2 (N.D. Ill. Dec. 16, 2009) (dismissing class action claim challenging late payment fees charged by UPS because the late payment fee related to the prices UPS charged customers).

In short, and in sum, the threshold set by the Supreme Court for determining whether a law has an impermissible effect on prices, routes or services exceedingly low. *E.g.*, *DiFiore v. American Airlines*, 646 F.3d 81, 86 & n.4 (1st Cir. 2011) (Airline Deregulation Act case citing ADA and FAAAA precedents "interchangeably"; "All three of the major Supreme Court cases

endorsed preemption and read the preemption language broadly"); *Treiber & Straub, Inc. v. United Parcel Serv., Inc.*, 474 F.3d 379, 386-87 (7th Cir. 2007) (ADA case; claims which seek to avoid, rather than enforce, a defendant's contractual obligations are preempted). The IWPCA's effect on motor carriers easily exceeds this threshold, and therefore is preempted.

## II. 820 ILCS 115/2 IS EXACTLY THE TYPE OF STATE LAW RELATING TO THE SETTING OF PRICES AND RATES THAT IS PREEMPTED BY THE FAAAA

### A. The IWPCA and Its Impact on Motor Carriers

Under the IWPCA, a company may only properly classify someone as an independent contractor if all three of the following requirements are met: (A) the person is "free from control and direction" over the performance of his work; (B) services must be performed either "outside the usual course of business" or outside of all of the places of business; and (C) the person must be in "an independently established trade, occupation, profession or business." 820 ILCS 115/2. For purposes of the second requirement, Illinois court decisions suggest that dispatched drivers are regarded as engaging in the business of the dispatching company. *See, e.g., Carpetland U.S.A., Inc. v. Ill. Dep't of Employment Security*, 201 Ill.2d 351, 386-88 (Ill. 2002). By this logic, couriers would be acting in the usual course of a same-day delivery business. *See, e.g., United Delivery Service, Ltd. v. Didrickson,* 276 Ill.App.3d 584, 588-89 (1st Dist. 1995). Under these decisions, even if BeavEx fully complied with the A and C prongs of the statute, it does not seem possible under Illinois law for BeavEx to structure its business or arrange its relationship with its couriers to comply with the second requirement.

### 1. BeavEx's Current Business Model

BeavEx is a same-day delivery service company with clients across the country, including in Illinois. SOF ¶1. BeavEx coordinates and provides delivery services for compensation through independent contractors, who drive their own cars or trucks. SOF ¶3.

BeavEx offers its clients both scheduled-route and on-demand delivery services. SOF ¶4. With regard to scheduled-route services, BeavEx's clients dictate regular times and locations that pick-ups and/or drop-offs must be made. SOF ¶5. BeavEx locates couriers who can accommodate a client's pick-up/drop-off schedule and then engages them as contractors. SOF ¶6. At this time, BeavEx has approximately 280 scheduled routes in Illinois that it coordinates on a regular basis, and contracts with 104 couriers who drive these routes. SOF ¶7.

With regard to on-demand delivery services, BeavEx often receives calls from clients for rush deliveries (such as pharmacies delivering medications in acute care situations). SOF ¶9. By their very nature, on-demand jobs are variable and unpredictable: some days may have dozens of on-demand rush jobs, while others may have none. SOF ¶10. BeavEx is able to offer this service to its clients by engaging various couriers on an exigent basis. SOF ¶12. Each day, couriers will contact BeavEx and state their availability to provide deliveries. SOF ¶13. If the clients' needs coincide with the couriers' availability, BeavEx will offer the various deliveries to the available couriers. SOF ¶14. Couriers can (and do) reject on-demand job offers from BeavEx. SOF ¶15. While the numbers fluctuate, 104 couriers (on average) perform approximately 280 scheduled routes and 40 on-demand deliveries for BeavEx weekly in Illinois. SOF ¶¶7, 8, 11.

To handle administrative and warehouse duties, BeavEx currently employs 9 full-time employees and 1 part-time employee in Illinois. SOF ¶16. BeavEx's Illinois employees are paid on an hourly or salary basis, and receive health insurance and other benefits (including company paid time off, disability insurance, life insurance, etc.). SOF ¶17. BeavEx provides workers' compensation insurance, pays payroll taxes, and makes unemployment insurance contributions for its Illinois employees. SOF ¶18. On the other hand, BeavEx presently engages 104 couriers

as independent contractors in Illinois. SOF ¶¶3, 8, 19-21. These courier-contractors are paid for each delivery they complete, not by the hour or week. SOF ¶19. BeavEx does not provide its couriers with benefits such as health insurance or retirement, it does not offer workers' compensation, and it does not pay payroll or unemployment insurance taxes. SOF ¶¶20-21.

Because it has so few employees, and thus relatively few employment-related issues, BeavEx does not employ a dedicated human resources professional in Illinois; instead, it administers the human resources function centrally through BeavEx's corporate headquarters in Atlanta, Georgia where the corporate human resources manager and the Senior Vice President of Administration are based. SOF ¶¶22-23. Any local or regional employment issues currently are handled on an *ad hoc* basis by the local terminal manager in consultation with the corporate human resources manager or the Senior Vice President of Administration in Atlanta, Georgia. SOF ¶24. The current human resources structure at BeavEx is centralized in Atlanta, Georgia, where a small team of human resources professionals handle human resources functions for the entire country. SOF ¶25.

### 2. Structural And Monetary Changes BeavEx Would Be Required To Make If Prohibited From Engaging Independent Contractors

If required to engage its independent contractor-couriers as employees, BeavEx would have to make fundamental changes to its business model, operations, and to the prices and services offered. Because of the far greater complexity of managing dozens of employees (rather than a small handful), BeavEx would need to create a human resources function, and hire someone to staff it. The additional liability exposure created by having employees rather than contractors would necessarily require BeavEx to invest in recruiting and selection procedures. BeavEx would need to provide employee-drivers with insurance and other benefits, and pay various payroll taxes and contributions, which are not required for contractors. It would need to

create and maintain employment policies and procedures. Further, employees are paid by the hour, and receive mileage and benefits that contractors do not receive. And employees are protected by laws regarding wages, hours, breaks and time off that do not apply to independent contractors, which would affect how BeavEx structures its routes and services and, ultimately, the pricing it would need to charge its customers for those routes and services (which pricing would ultimately impact end-consumers and/or potentially BeavEx's ability to maintain current customer contracts or secure future business).

**Courier Hours and Compensation**. Independent contractor-couriers at BeavEx are paid by the route. SOF ¶19. If engaged as employees, these couriers would instead be paid by the hour, and would be given fringe benefits and mileage compensation. SOF ¶26. If engaged as employees instead and given an hourly rate, benefits and mileage, the cost of labor would increase substantially. SOF ¶27. Same-day courier companies that operate their business with employee-drivers typically own the vehicles used by the employee-couriers, while independent contractor-couriers use their own vehicles to provide the delivery services. SOF ¶¶28-29. Company-owned vehicles are stored on company premises. SOF ¶28. While independent contractor-couriers using their own vehicle start the day at their first pick-up and end it with their last delivery, employee-drivers must start and end their workday at the company's worksite. SOF ¶¶28-30. For BeavEx, these additional "stem miles" to and from BeavEx's main Illinois facility would increase miles driven and hours worked (and thus hours paid). SOF ¶31.

**Human Resources**. Undeniably, running a business with a handful of employees is different from running a mid-sized company with approximately 200 employees. A mid-sized company is exposed to a range of state and federal employment laws that either do not affect smaller business or do not apply to independent contractors. Likewise, the complexity of

9

managing a workforce increases with the number of employees. These legal and managerial challenges require mid-sized employers to employ human resource professionals to assist them in managing a compliant workforce. SOF ¶32-33. Moreover, Illinois and federal employment laws impose an array of direct obligations and requirements that do not apply to contractor-based businesses.

Employment discrimination laws also impose affirmative obligations. Companies must be ready to investigate allegations of harassment, discrimination or retaliation brought by employees – which can be time-consuming and intricate – and then remedy any issues found. Employees with disabilities may be eligible for reasonable accommodations; ascertaining whether an employee is disabled and what accommodations to provide can likewise be a significant task. Accommodations must also be made for employees' religious practices. Again, independent contractors are not eligible for these protections.

As noted, BeavEx currently has just 10 employees (1 of whom is part-time) in the state of Illinois. Any personnel issues that arise are handled informally by the Terminal Manager in consultation with corporate headquarters. If BeavEx is forced to engage its couriers as employees, BeavEx would no longer be able to handle its regional human resource challenges on a corporate-wide basis. Rather, BeavEx would have to create a dedicated regional or district human resources function, including a regional human resources manager as well as administrative support. SOF ¶32. The pure cost of labor for a transportation company like BeavEx just to employ and maintain a regional or district human resource manager and administrative support for the function would be approximately $185,000 per year (exclusive of additional costs associated with office space, company provided cellular phones, recruiting, development and training, etc.). SOF ¶33.

**Scheduling**. State laws applicable to employees would also impose significant restrictions on how and when BeavEx couriers can work. Employees are entitled to pay at time-and-a-half rates for any hours worked over 40 in a week. 29 U.S.C. § 207; 820 ILCS 105. Time that an employee spends on-call must be paid, at the employee's hourly rate, if the employee is not "effectively free to use his or her time for his or her own purposes." 29 C.F.R. 785.17. And, an employee cannot work more than seven and a half continuous hours without taking a twenty minute, uninterrupted meal break, which break must be provided within five hours of the start of the work. 820 ILCS 140. These rules do not apply to independent contractors.

B.      The IWPCA's Impact on Motor Carriers "Relates To" Prices and Services

1.      Increased Costs will Directly Change BeavEx's Prices and Services

Converting couriers from independent contractors to employees would dramatically increase BeavEx's costs, inescapably affecting its prices, routes and/or services. As detailed above, if BeavEx was obligated by the IWPCA to revamp its business model by hiring couriers as employees, its labor costs would be impacted substantially. These greater costs would directly and inevitably affect BeavEx's prices. Basic economics holds that prices are set where the supply curve intersects the demand curve. When the cost of providing a service increases, the supply curve shifts up and to the left, resulting in higher prices. *Sanchez v. Lasership, Inc.*, -- F.Supp.2d --, -- 2013 WL 1395733, at *17 (E.D. Va. April 4, 2013) ("Anything that changes production costs will shift the supply curve, and hence will result in a new equilibrium price") (quoting Ben S. Bernanke & Robert H. Frank, PRINCIPLES OF MICROECONOMICS 57 (3d ed. 2007)). Said differently, and quite obviously, a for-profit business cannot charge less than cost for a product or service, and still make money. *Id*. ("Consistent with basic economics, therefore,

11

the high costs incurred by [810 ILCS 115/2's] compliance will undoubtedly have to be recouped by raising prices").

Courts have recognized that costs are intertwined with prices in the FAAAA context. In *Prof'l Towing & Recovery Operators v. Box*, 2008 WL 5211192 (N.D. Ill. Dec. 11, 2008), this Court granted a preliminary injunction in part based on FAAAA preemption. This Court observed that "other courts persuasively have read *Rowe* as standing for the proposition that if the *'effect* of the regulation would be that carriers would have to offer different services than what the market would otherwise dictate, the law ha[s] a sufficient effect on carrier services for preemption to apply.'" *Id*. at *8 (quoting *ATA*, 577 F. Supp.2d 1110, 1117 (C.D. Cal. 2008), italics in original). Accordingly, this Court found FAAAA preemption because where, as here, "even if a state law or regulation does not have a direct impact on prices, in that it does not expressly set or limit prices, the law or regulation may have a substantial indirect effect on prices to the extent that it can be shown to impose significant additional costs on [motor carriers] that they, in turn, may pass on to their customers." *Id*. *See also United Parcel Serv., Inc. v. Flores-Galarza*, 318 F.3d 323, 336 (1st Cir. 2003) (noting that the high cost of verifying that each recipient paid state excise tax would "necessarily have a negative effect on UPS's prices"); *Aretakis v. Fed. Express Corp.,* 2011 WL 1226278, at *4 (S.D.N.Y. Feb. 28, 2011) (finding FAAAA preemption because added costs were likely to be passed on to customers and thus had "a direct impact on the fees [a motor carrier] charges for its services"); *Lasership*, 2013 WL1395733, at *17 (same).

The *ATA* litigation reflects this well. On remand, the District Court there found that requiring motor carriers at the Port of Los Angeles to use employees "would increase drayage operational costs by 167%" and "add an estimated $500 million to the annual operating costs of

Port drayage." *ATA*, 2010 WL 3386436, at *19 (C.D. Cal. Aug. 26, 2010). The District Court concluded that because of these increased costs, "drayage services prices thus would *need to increase*." *Id.* (emphasis supplied). Because "at least some of the increased costs of drayage services caused by the employee courier provision will impact drayage pricing," the court found that the employee-driver requirement implicated the FAAAA. *Id.*[3]

Just as the higher labor costs affected prices and services in *ATA*, so too would the IWPCA directly affect BeavEx's pricing. With employee-drivers, BeavEx's "price floor" would necessarily skyrocket; faced with this precipitous cost increase, BeavEx would have no choice but to increase prices. SOF ¶¶34-35. Moreover, some routes would simply become unprofitable – prices could never catch up with these ballooning costs – and would need to be eliminated. SOF ¶¶36-37. Increasing prices and eliminating routes are the very effects that the FAAAA was designed to curb. The IWPCA is therefore preempted by the FAAAA. *See Lasership*, 2013 WL 1395733, at *17.

### 2. With Employee-Drivers, BeavEx Would Need to Change Its Routes and Services

The on-demand rush delivery services BeavEx now offers are variable; there is no way to predict when, where or how many on-demand jobs will be requested by clients in any given day. BeavEx thus has a number of couriers who volunteer to be at the ready to handle these deliveries. As independent contractors, BeavEx need not pay its couriers for time spent waiting but not working. If the couriers were employees, BeavEx would be required to pay them for time spent waiting for on-demand jobs to be requested. *See* 29 C.F.R. §785.16(a). These scheduling issues and cost increases, along with the other additional costs discussed above, mean BeavEx would be

---

[3] The District Court ruled that FAAAA preemption nevertheless did not apply under the "market participant exception." *Id.* at *33. The Ninth Circuit reversed and entered a final judgment that the employee requirement was preempted by the FAAAA. *ATA*, 660 F.3d 384, 407-08 (9th Cir. 2011).

unable to profitably provide an on-demand service to its clients, and would cease offering it. SOF ¶38. In other words, BeavEx would need to create routes determined not by customer demands, but rather by the exigencies of an employee labor model forced on it by the IWPCA. Using employees rather than contractor-couriers would therefore require BeavEx to change the routes and services it offers its clients, in contravention of the FAAAA. *See Treiber & Staub*, 474 F.3d at 387 (a state rule that "would compel a certain kind of service … would, in effect, be a rule having the force and effect of law relating to rates, routes or services …").

      **C.**      **Both Congress And The United States Attorney General Recognize That The FAAAA Preempts Prohibitions Against The Use of Independent Contractors**

Congress and the United States Attorney General, who enforces federal law, have both expressly recognized that the FAAAA preempts state laws like IWPCA Section 2.

The FAAAA's legislative history explains that in 1993, California attempted to exempt the state's motor carriers from certain regulations – but only those motor carriers that used *employees* rather than independent contractors. (Exh. B at 87). This California law therefore discouraged motor carriers from engaging independent contractors, and encouraged motor carriers to use employees. The FAAA's legislative history singled out this California law as the type of state law which the FAAA should preempt. (Exh. B at 87) (explaining the "need for" the FAAA's preemption provision, and explaining that preemption of state laws like California's law discouraging the use of independent contractors would be "in the public interest as well as necessary to facilitate interstate commerce"). If Congress intended for the FAAAA to preempt a state law that only ***discouraged*** independent contractors, then *a fortiori* the FAAAA preempts the IWPCA's prohibition on the use of independent contractors by motor carriers like BeavEx.

In the *ATA* litigation, the United States filed an amicus brief in the case's first trip to the Ninth Circuit. The United States' amicus brief specifically addressed the Port of Los Angeles'

attempt to prohibit the hiring of independent contractors and to mandate the use of employees. "[T]he Port of Los Angeles' hiring restrictions on independent owner-operators," the United States argued, was an "attempt to shape the labor forces of motor carriers …" (Exh. A at 19). And, that "attempt to shape the labor forces of motor carriers," the United States concluded, "is the type of state economic regulation that Congress sought to preempt with the FAAAA." (*Id*.) And, of course, that is exactly what the Ninth Circuit held. *ATA*, 559 F.3d at 1056 (the Port of Los Angeles' attempt to "decide who can use whom for drayage services [the transportation of containers from ships to distribution centers] is a palpable interference with [motor carrier] prices and services" which was preempted by the FAAAA as a matter of law). *Accord Central Transport, Inc. v. Public Service Commission*, 223 Mich. App. 288, 309 (1997) (FAAAA preempted a state statute requiring motor carriers to use employees because the law impermissibly "affects routes and services and most probably affects prices").

There is absolutely no sound reason for this Court to ignore Congress' intended purpose of the FAAAA's preemption provision, or the United States' considered views on a similar law prohibiting independent contractors and mandating the use of employees, or the Ninth Circuit's decision applying the United States' views.

### III.  CONCLUSION

The Illinois Wage Payment and Collection Act bars BeavEx from using independent contractors, instead mandating that they use employees. Such interference with motor carriers' operations and services is *per se* prohibited by the FAAAA. Further, this law would have a direct and material effect on the prices, routes and/or services offered by BeavEx. The Court should therefore find that the Illinois Wage Payment and Collection Act, 820 ILCS 115/2 is preempted by the FAAAA and grant Defendant summary judgment on all claims.

                Respectfully submitted,

                BEAVEX INC., Defendant

                By:   /s/ Kevin M. Duddlesten
                            Kevin M. Duddlesten

Kevin M. Duddlesten, *admitted pro hac vice*
Texas Bar No. 00793644
MCGUIREWOODS LLP
816 Congress Ave., Suite 940
Austin, Texas 78701-2442
(512) 617-4516
(512) 617-4586 (Fax)

Teri L. Danish, *admitted pro hac vic*
Texas Bar No. 05375320
MCGUIREWOODS, LLP
600 Travis Street, Suite 7500
Houston, Texas 77002
(832) 214-9911
(832) 214-9915 (Fax)

**CERTIFICATE OF SERVICE**

      I certify that on this 13th day of August, 2013, a true and correct copy of the foregoing instrument was forwarded to counsel of record, *via* e-file notification, to all counsel of record:

                                                     /s/ Kevin M. Duddlesten